UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

04 MAR 25 PM 2: 35

U.S. DISTRICT COURT
N.D. OF ALABAMA

ROBERT MITCHELL; FRANKIE )
MITCHELL,                 )
                          )
        Plaintiff,        )
                          )
    vs.                   )      CV 01-B-1800-S
                          )
ZURICH AMERICAN INSURANCE )
CO.,                      )
                          )
        Defendant.        )

ENTERED

MAR 25 2004

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary

Judgment, (doc. 20),[1] plaintiff's Motion to Amend, (doc. 25), and defendant's Motion to

Strike, (doc. 28).   Plaintiffs Robert and Frankie Mitchell have sued defendant Zurich

American Insurance Company, alleging breach of contract and bad faith failure to pay

insurance benefits.   Upon consideration of the record, the submissions of the parties, the

arguments of counsel, and the relevant law, the court is of the opinion that defendant's

Motion for Summary Judgment, (doc. 20), is due to be granted; plaintiffs' Motion to Amend,

(doc. 25), is due to be denied, and defendant's Motion to Strike, (doc. 28), is due to be denied

as moot.

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each
document as it is filed in the court's record.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving parties to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving parties is to be believed and all justifiable inferences are to be drawn in their favor. *See id.* at 255. Nevertheless, the non-moving parties need not be given the benefit of every inference but only of every ***reasonable*** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

2

## II. **STATEMENT OF FACTS**

In January 1995, plaintiffs contracted with Keith Russell and Russell Building Company for the construction of a house on Bridge Lake Drive in Birmingham, Alabama. (Doc. 22, Ex. F at 24.)  When construction began, Mr. Mitchell asked Russell Building Company to procure liability insurance for him. (*Id*. at 31-32.)  Russell or its insurance agent provided plaintiffs with a Certificate of Insurance for which plaintiffs paid $1,200. (*Id*. at 31, 32.)  Mr. Mitchell testified that he thought the policy "would cover anything that was done wrong and created a problem that had to be fixed." (*Id*. at 34.)

The Certificate of Insurance indicated a policy period from December 31, 1994 until December 31, 1995, for general liability coverage. (Doc. 22, Ex. A)  It states that plaintiffs are "Additional Insured[s] as their interest may appear for General Liability as respects [construction] of house on Lot 3, Bridge Lake Drive, Hoover." (*Id*.)  It also states, "THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER.  THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW." (*Id*.)  Sandra Roy, an Account Specialist with defendant, testified, "A Certificate of Insurance is purely to support the fact that there is an insurance policy behind the named insured.  It is just proof of insurance. It is not an insurance policy." (Doc. 22, Ex. E at 12, 117.)  Defendant's underwriting file for Russell Building did not reflect the Certificate of Insurance or any other documentation naming plaintiffs as additional insureds. (*Id*. at 121-22.)

3

When plaintiffs moved into the house in January 1996, they noticed water damage. (Doc. 22, Ex. F at 37.) The water damage occurred as a result of improper installation of a deck on the rear of the house, and the water damage to the house probably began as soon as the deck was installed. (*Id.*) Plaintiffs also experienced some problems with Dryvit installed on the house. (*Id.* at 41.)

Mr. Mitchell spoke with Russell many times about the problems with the house. (*Id.* at 39.) Russell told Mr. Mitchell that he would fix the problems, but that he did not know how. (*Id.*) Mr. Mitchell contacted Ard Contracting, Inc. about the problems; representatives from Ard Contracting examined his house and determined that the problems could be fixed. (*Id.* at 41.)

On June 24, 1999, Mr. Mitchell wrote to Russell, giving him formal notice of the problems. (*Id.* at 42-43.) Russell submitted a claim based on plaintiffs problems to defendant, through its insurance agent, on July 1, 1999. (Doc. 22, Ex. D at 11-12.) Laura White, an Account Specialist with defendant, testified that she processed the claim notice as notice of a third-party claim by plaintiffs against defendant's insured, Russell Building. (*See id.* at 12; *see generally id.* at 12-16.)

As part of the claims process, White contacted Mr. Mitchell. (*Id.* at 12.) Mr. Mitchell testified as follows regarding his conversations with White:

> Q.   Okay.   What do you recall as being your first contact with [defendant] or a representative of [defendant] about the problems you were having with –

A. I did call Laura White, . . . and told her what the situation was. I told her that we had a commercial contractor who felt he could repair it, knew what the problem was, told them that the deck was in danger of falling, that they had to come out and brace it with metal braces to keep it from falling, and, therefore, it's a very dangerous situation, and I wanted to begin immediately.

And she said to send – as I recall, asked me to send her a copy of the estimate for the repairs, and she, at some point, told me that they were going to hire an investigator or an inspector or an engineer, possibly, and he was out of Atlanta, and that he would come – that he wanted to be – she wanted to make sure that we kept him informed of everything we did. Prior to beginning work, we were to call him. As we found additional damage, he was to be informed. So I turned that over to Ard and asked them to make sure he was informed every time something came up, and I think they kept in real close contact, and he came over – I don't know how many times he came over.

And so we began construction, and when I received the first bill from Ard, which would have been thirty days after construction, I believe – I think they were billing me monthly – I called Ms. White and asked her . . . should I submit the bill to her for payment, and she said, no, said, just wait until the job is completely finished, gather all of your bills up, send them to [defendant], and [defendant] would then pay [the bills].

Q. Now, did she tell you that they would pay the bills in full?

A. I don't remember exactly what she said. I mean, I was always led to believe they would be paid in full, yes.

Q. Now, you had a conversation with her . . . presumably in response to the July 2, '99 letter. At that time did she indicate whether there would be any coverage problems for the claim that you were making?

A. No.

Q. And then your next conversation with her – when was that?

A. I really don't recall. As I recall, . . . she and I had two or three conversations during the construction, possibly, and then the last conversation I had with her, I think is when I had submitted the bills to her for payment and hadn't received anything. And I think I called her, and she said that file had

> been given to somebody else. I think she said that person possibly didn't work
> there anymore, but that she would go retrieve it and have somebody call me,
> and somebody did call me.

(Doc. 22, Ex. F at 56-59.)

The repair costs submitted to defendant totaled $130,036.60. (*Id.* at 79.) When

defendant did not pay the bills, Mr. Mitchell contacted White again, and she told him that

someone else was handling his file. (*Id.* at 68.) Thereafter, Mr. Mitchell spoke with Roy.

(*Id.* at 69.) Mr. Mitchell testified to the content of his conversation with Roy as follows:

> The long and short of it was she advised me to sue [Russell Building], and I
> was kind of taken aback and told her that I was a businessman and I didn't sue
> people, not that I wanted to, and she said the only way you're going to get your
> claim paid is if you file suit, it will bring all of the parties to the table, and
> they'll pay it, but you've got to sue to pay – to get paid.

(*Id.* at 69-70.)

Roy testified that the policy at issue is a "general liability policy. It's not a first-party

claim or a first-party policy. It's an indemnity policy." (Doc. 22, Ex. E at 106.) She also

testified, "[A]s the claim was presented, as a third party loss, there was never any indication

Bob Mitchell was an insured under the policy. The claim was presented by Russell Building

Company." (*Id.* at 26, 101.) Roy added, "[T]here may be an exclusion that I believe would

fit that circumstance that may ultimately provide no coverage to Mr. Mitchell." (*Id.* at 27,

105.) She testified:

> Q. So you don't believe that policy insures Mr. Mitchell against claims
> for negligent construction of Russell Building?

6

A.  The policy insures Russell Building and if it is to be assumed that it also insures Robert Mitchell, then I don't believe that it's covered for a first-party loss.

Q.  What do you base that on?

A.  Based on the fact that this is an indemnity policy for third-parties that are presenting claims.

. . .

A.  Mr. Mitchell would no longer be a third-party, he would be a first-party.

Q.  And where is that in the contract?

. . .

A.  One of the exclusions which is damage to property, which is J under the exclusions, property damage to, number one, property you own, rent or occupy.

(*Id.* at 107-08.)

Plaintiffs filed the instant action in the Circuit Court of Jefferson County, Alabama.

In their Complaint, plaintiffs alleged:

3.  For valuable consideration, the Defendant, Zurich American Insurance Company . . . agreed to provide the Plaintiffs with general liability coverage as to the construction of their home.  The contract number assigned to the Plaintiffs' policy was RGP21203360.

4.  In January, 1996, the Plaintiffs moved into their new home . . . . Shortly after moving, in [sic] the Plaintiffs began experiencing problems with water damage.  It was determined that the water damage occurred as a result of the improper installation of the [D]ryvit which caused substantial structural damage.

5.  The Plaintiffs have submitted to the Defendant[ ] a claim for the fair market value of the repairs to the home[,] which totaled $130,036.60.

6. The Defendant[ ] [has] denied the claim of the Plaintiffs for benefits underneath the Certificate of Insurance issued to [them].

7. The Plaintiffs aver that the Certificate of Insurance issued to them by the Defendant[ ] provided coverage for the construction of the home, but the Defendant[ ] [has] failed and/or refused to pay the claim.

COUNT I
(Breach of Contract)

. . .

9. Plaintiffs aver that at the time of the construction they had a valid contract of insurance with the defendant bearing policy number RGP21203360. The named insured on the policy was Russell Building Company with the Plaintiffs, Bob and Frankie Mitchell as addressed insured[s].

10. Plaintiffs aver that the loss they suffered due to the construction of the home was a covered loss under said policy of Insurance.

11. Plaintiffs aver that the Defendant breached said contract of insurance by failing to pay their claim which was a covered loss under the policy.

COUNT II
(Bad Faith)

. . .

13. The Plaintiffs aver that the Defendant[ ] [has] intentionally and willfully, and without any arguable reason, failed and refused to pay the Plaintiffs' claim. The Plaintiffs aver that the Defendant['s] intentional and willful refusal to pay the claim without any arguable reason constitutes a bad faith refusal to pay a just claim.

14. As a direct and proximate consequence of the intentional acts of the Defendant[ ] in refusing to pay a legitimate claim, the Plaintiffs have been caused to suffer mental anguish, loss of income, and have been denied the benefits of the Certificate of Insurance.

8

(Doc. 1, Ex. A.)

On February 12, 2003, plaintiffs filed a Motion for Leave to Amend Complaint. (Doc.

25.) In this Motion, plaintiffs allege –

> 2. During discovery, the Plaintiffs learned that the insurance carrier did not consider them named insured[s] under the policy.

> 3. Further, the Plaintiffs learned during discovery that the insurance carrier considered them third party claimants on the policy of insurance made the basis of this suit.

> 4. The Plaintiffs aver that representations were made to them concerning their claim by agents and employees of the Defendant, Zurich Insurance Company.

> 5. Specifically, the Plaintiffs aver that they were instructed by the insurance carrier to submit bills concerning the repairs to their home directly to the carrier for payment.

> . . .

> 7. Plaintiffs move this Honorable Court to allow them to amend their Complaint to add claims for breach of contract and misrepresentation.

(*Id.*) Defendant filed a Motion to Strike and Objection, in response to plaintiffs' Motion for

Leave to Amend, (doc. 28); defendant's Motion to Strike is, in essence, merely an opposition

to the Motion for Leave to Amend.

### III. DISCUSSION

### A. MOTION FOR SUMMARY JUDGMENT

In their Complaint, plaintiffs allege that they were first-party insureds under policy

number RGP2120336021 issued by defendant. They contend defendant breached this policy

by not paying their alleged covered claim, and that the decision not to pay plaintiffs' claims

was made in bad faith.  Defendant has moved for summary judgment as to plaintiff's claims

on the ground that plaintiffs' claim is not covered under the policy; and, because there is no

basis for recovery under the terms of the policy, plaintiffs cannot maintain an action against

defendant for bad faith failure to pay insurance benefits.

### 1. Breach of Contract Claim

Plaintiffs contend that defendant breached its insurance contract with them when it

refused to pay their claim for repairs on their home.  Plaintiffs contend that they are insureds

under the policy at issue based on the Certificate of Insurance, which states that plaintiffs,

as Certificate Holders,  are "Additional Insured[s] as their interest may appear for General

Liability as respects [construction] of [their] house."  (*See* doc. 22, Ex. A.)

Assuming plaintiffs are first-party insureds based upon the Certificate of Insurance,

their claims against defendant for payment of benefits based on damage to their own house

are excluded by the plain terms of the policy.  The policy specifically excludes claims for

"'[p]roperty damage' to . . . [p]roperty [the insureds] own, rent or occupy." (Def. Evid. Sub.,

Ex. G [Residential General Contractor Commercial Liability Coverage Form] at 2, 4.)  Such

an exclusion is "[a] hallmark of the comprehensive general liability policy is that it insures

against injury done to a third party's property, in contradistinction to an 'all-risks' policy also

covering losses sustained by the policy-holder." *See Bausch & Lomb Inc. v. Utica Mut. Ins.*

*Co.*, 625 A.2d 1021, 1033 (Md. 1993)(citation omitted).

Under Alabama law, "[I]nsurers have the right to limit their liability by writing

policies with narrow coverage.  If there is no ambiguity, courts must enforce insurance

contracts as written and cannot defeat express provisions in a policy, including exclusions from coverage, by making a new contract for the parties." *St. Paul Mercury Ins. Co. v. Chilton-Shelby Mental Health Center*, 595 So.2d 1375, 1377 (Ala. 1992)(citing *Johnson v. Allstate Insurance Co.*, 505 So. 2d 362 (Ala. 1987)). The policy at issue in this case contains an unambiguous provision excluding from coverage claims for property damage to property owed by the insured. (Def. Evid. Sub., Ex. G [Residential Contractor Commercial Liability Coverage Form] at 2, 4.)

Therefore, assuming plaintiffs are first-party insureds under policy number RGP21203360, as alleged in their Complaint, (*see* doc. 1, Ex. A at ¶ 3), their claims based on damage to their own home are excluded by the plain language of the policy. However, if the court assumes that plaintiffs' claims against the policy are third-party claims payable based on the actions of Russell Building Company[2] as the insured, their claim for breach of contract against defendant fails because plaintiffs do not have a judgment against Russell Building Company.[3]

Under Alabama law, "the fundamental and well-established general principle [is] that an accident victim (a third party to a liability insurance contract) cannot maintain a direct action against the insurer for the alleged liability of the insured where the legal liability of

---

[2]The court notes that nowhere in plaintiffs' Complaint do they allege a breach-of-contract claim based on claims against defendant as the insurer of Russell Building Company.

[3]The fact that plaintiffs have not sued Russell Building Company for damage to their house is not disputed by the parties.

11

the insured has not been determined by judgment." *Williams v. State Farm Mutual Automobile Insurance Co.*, No. 1021758, 2003 WL 22977464 at *2 (Ala. Dec. 19, 2003)(quoting *Howton v. State Farm Mutual Automobile Insurance Co.*, 507 So. 2d 448, 450 (Ala. 1987)). Plaintiffs have not sued Russell Building Company. (*See* doc. 22, Ex. F at 69-70.) Therefore, any arguable breach of contract claim claim directly against defendant based on Russell Building Company's liability to plaintiffs is due to be dismissed because the legal liability of Russell Building Company has not been determined by judgment.

Based on the foregoing, plaintiffs' breach of contract claim will be dismissed.

## 2. Bad Faith Refusal to Pay Claim

Under Alabama law, a plaintiff must show that he is entitled to a directed verdict on his claim for benefits under a policy of insurance before he may maintain a claim of bad faith refusal to pay benefits under that policy of insurance. As the District Court for the Middle District of Alabama has noted:

> In "normal" bad-faith cases, the Alabama Supreme Court has applied a "directed-verdict-on-the-contract-claim" standard; under that standard, "the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury." [*National Savings Life Insurance v.*] *Dutton*, 419 So.2d [1357,] 1362 [(Ala. 1982)]. For a "normal" bad-faith claim, then, an issue of fact with regard to the validity of the plaintiff's insurance claim will prevent the bad-faith claim from being submitted to the jury. In other words, for a "normal" bad-faith claim, if there *is* genuine issue of fact as to whether the insurer legitimately denied the plaintiff's insurance claim, summary judgment should be granted rather than denied. *See, e.g., S & W Properties v. American Motorists Ins. Co.*, 688 So.2d 529, 533 (Ala. 1995)("All of the evidence . . . suggests a dispute

12

over a genuine issue of material fact.  Therefore, the plaintiffs did not show
that American Motorists had no legal or factual defense to the insurance claim
. . . .[and] the judge properly entered the summary judgment for the insurer.").

*See Nobles v. Rural Community Ins. Services*, CV No. 00-T-375-S, 2004 WL 343570, *11-12

(M.D. Ala. Feb. 24, 2004)(emphasis in original).; *see also Sherrin v. Northwestern Nat. Life

Insurance Co.*,  2 F.3d 373, 380 (11th Cir. 1993)("As a general rule, [under Alabama law],

when a fact issue exists as to the validity of the insurance claim, the bad faith claim should

not be submitted to the jury and summary judgment for the defendant is proper.")(citing

*Turner v. State Farm Fire and Casualty Cos.*, 614 So.2d 1029 (Ala. 1993) and *Dutton*, 419

So. 2d 1357).

Because, for the reasons stated above,  the court finds plaintiffs do not have a valid

claim to benefits under the policy at issue in this case, plaintiffs' bad-faith claim will be

dismissed.

## B.  MOTION TO AMEND/MOTION TO STRIKE

Plaintiffs have filed a Motion for Leave to Amend Complaint in which they ask the

court for permission to amend their Complaint to add a claim for breach of contract and a

claim for misrepresentation, based on White's statements to Mr. Mitchell that defendant

would pay for the repairs when the bills for such repairs were submitted.  (Doc. 25 and

proposed Amended Complaint, attached thereto.)  Plaintiffs contend, in their Motion for

Leave to Amend, that they learned during discovery that defendant "did not consider them

named insured[s] under the policy" and that defendant "considered them third party

claimants."  (Doc. 25 ¶¶ 2-3.)  They also allege that "they were instructed by the insurance

carrier to submit bills concerning the repairs to their home directly to the carrier for payment." (*Id.* ¶ 5.) Plaintiffs do not allege any reason why they were unable, with due diligence, to amend their Complaint to add these claims by the deadline set forth in the parties Scheduling Order.

The Court's Scheduling Order required plaintiffs to file any amendments to their pleadings on or before December 17, 2001, (doc. 7); plaintiffs' Motion for Leave to Amend was filed on February 12, 2003, (doc. 25). Rule 16(b) provides, "A schedule shall not be modified *except upon a showing of good cause* . . . ." Fed. R. Civ. P. 16(b)(emphasis added); *see also* Doc. 7 at 1 (This [scheduling] order governs further proceedings in this action *unless modified for good cause shown*.")(emphasis added). "This good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'" *Sosa v. Airprint Systems, Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998)(quoting Fed. R. Civ. P. 16 advisory committee's note), *cited in Nobles*, 2004 WL 326719 at *4 ("The court's focus in evaluating a motion to amend under Rule 16 is on [the moving party's] diligence; that is, the court may grant the late-filed motion if the pretrial schedule could not reasonably have been met despite [the moving party's] diligence. If [the moving party was] not diligent, the court's inquiry should end.)(citations omitted).

All witnesses and information in support of their proposed new claims were available to plaintiffs at a time before this court's December 17, 2001 deadline for amending the pleadings. Plaintiffs offer nothing in support of their Motion for Leave to Amend in the way of an excuse or explanation as to why, with due diligence, they could not comply with the

14

established deadline for amending their Complaint.  Therefore, plaintiffs' Motion for Leave to Amend will be denied.[4]

Defendant, in response to plaintiffs' Motion for Leave to Amend, filed a Motion to Strike Motion for Leave to Amend.  (Doc. 28.)  Because the court finds that plaintiffs have failed to show good cause for not amending their Complaint during the time set forth in the court's Scheduling Order, defendant's Motion to Strike is moot.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law as to the claims set forth in plaintiffs' Complaint.  Plaintiff's Motion for Leave to Amend will be denied as plaintiffs have failed to show good cause for not complying with the court's Scheduling Order; defendant's Motion to Strike plaintiffs' Motion for Leave to Amend will be denied as moot. An order granting defendant's motion for summary judgment, (doc. 20), denying plaintiff's Motion for Leave to Amend, (doc. 25), and denying defendant's Motion to Strike, (doc. 28), will be entered contemporaneously with this Memorandum Opinion.

---

[4]At the hearing on defendant's Motion for Summary Judgment, the court told plaintiffs that it would consider a Motion to Amend their Complaint.  However, upon reconsideration, and after considering defendant's objections, the court has decided to deny plaintiffs' Motion to Amend.  The court's decision does not prejudice plaintiffs' right to file a new and separate action alleging breach of contract and misrepresentation based on White's statements to Mr. Mitchell that defendant would pay for the repairs to his house.

15

**DONE** this _24th_ day of March, 2004.

_Sharon Lovelace Blackburn_

**SHARON LOVELACE BLACKBURN**
United States District Judge